**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BARBARA and JOHN ZAPRALA,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| | : | **NO. 09-1238** |
| **USI SERVICES GROUP, INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |

**MEMORANDUM OPINION**

**Tucker, J.**                                                                                   **March ___, 2013**

Presently before the Court are Plaintiffs' Motion for a New Trial (Doc. 58) and

Defendant's Response in Opposition thereto (Doc. 59).  Upon consideration of the parties'

motions with briefs and exhibits, and for the reasons set forth below, Plaintiffs' motion will be

*denied*.

## I.  FACTUAL BACKGROUND

Plaintiffs Barbara and John Zaprala ("Plaintiffs" or the "Zapralas"), husband and wife,

brought this suit against Defendant USI Services, Inc. ("Defendant" or "USI") for personal

injuries sustained by Barbara Zaprala.  Barbara Zaprala was employed at the Macy's store in

King of Prussia Mall in King of Prussia, Pennsylvania.  On March 10, 2007, Barbara Zaprala

was leaving her work station at Macy's and going home for the evening.  At approximately 6:15

pm, Barbara Zaprala was walking inside the store toward the "Nautica entrance"[1] of the store

---

[1] The "Nautica entrance" is the entrance to the store where the Nautica men's department is or was located.

when she slipped and fell.  Barbara Zaprala alleged she fell because the tile floor was wet with a "slick spot," although no slick spot was ever identified by Plaintiff.  Barbara Zaprala sustained injuries to her left knee and left hand.  The injuries she received to her left knee later required surgery for knee replacement.  The surgery caused complications, which included an infection and a pulmonary embolism.

USI is an independent contractor that was under contract (the "Janitorial Contract") with Macy's to provide housekeeping services.  The Janitorial Contract also provided that one porter be on duty at the time of the alleged incident.  Barbara Zaprala asserted a claim against USI for negligence.  John Zaprala asserted a claim against USI for loss of consortium.  Jurisdiction was based on diversity of citizenship.

Plaintiffs' theory of the case was as follows.  Plaintiffs alleged that on March 7, 2007, three days before the accident, an inch and a half of snow fell on the top level of the Macy's store parking garage and on the domed plexiglass roof of a walkway outside of the Nautica entrance.  Plaintiffs claimed that between March 7, 2007 and March 10, 2007, temperatures were either below freezing or a little above freezing.  Plaintiffs claimed that on March 10, 2007, temperatures reached 62 degrees and the snow began to melt.  This allegedly caused Macy's customers to track melting snow from outside into Macy's, which ultimately resulted in Barbara Zaprala's slip and fall.  Plaintiffs argued that because Barbara Zaprala was a business invitee on the Macy's premises, USI had a duty to inspect and warn her of dangerous conditions.  Conversely, USI argued that its contract with Macy's was to provide specific janitorial services at the store.  USI maintained that its duties did not include patrolling Macy's to detect slippery conditions, and that Macy's personnel had not requested that USI provide any services in the area of Barbara Zaprala's fall.  Thus, USI claimed it owed no duty to Barbara Zaprala because it

had no actual or constructive notice of the alleged slippery condition, and in fact no slippery condition existed.

A six day jury trial was held from February 3, 2011 to February 9, 2011.  On February 9, 2011, the jury returned a verdict in favor of USI, finding that it had not been negligent.  Plaintiffs timely filed the instant motion for new trial.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 59(a) governs a motion for a new trial after a jury verdict.  A court may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a).  A court may grant a new trial on the grounds of: (1) improper admission or exclusion of evidence; (2) improper instructions to the jury; (3) newly discovered evidence exists that would likely have altered the outcome of the trial; (4) improper conduct by an attorney or the court unfairly influenced the verdict; (5) the jury's verdict is against the clear weight of the evidence; or (6) the verdict is so grossly excessive or inadequate as to shock the conscience.  See Goodman v. Pennsylvania Tpk. Comm'n, 293 F.3d 655, 676 (3d Cir. 2002) (citing Becker v. ARCO Chem. Co., 207 F.3d 176, 180 (3d Cir.2000)); Am. Bd. of Internal Med. v. Von Muller, 10-CV-2680, 2012 WL 2740852 (E.D. Pa. July 9, 2012); Suarez v. Mattingly, 212 F. Supp. 2d 350, 352 (D.N.J. 2002); Davis v. Gen. Acc. Ins. Co. of Am., 153 F. Supp. 2d 598, 599-600 (E.D. Pa. 2001); Griffiths v. Cigna Corp., 857 F.Supp. 399, 410–11 (E.D.Pa.1994), aff'd, 60 F.3d 814 (3d Cir.1995) (unpublished table decision).  Determining whether to grant a new trial is within the sound discretion of the trial court.  Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980); Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1017 (3d Cir.1995).

3

## III.  <u>DISCUSSION</u>

Plaintiffs raise eight assignments of trial court error which, they claim, entitle them to post-trial relief.  Plaintiffs' arguments fall into three categories of the aforementioned grounds for granting a motion for a new trial: (1) improper admission or exclusion of evidence; (2) improper instructions to the jury; and (3) the jury's verdict was against the clear weight of evidence.  The Court will address each of Plaintiffs' claims categorically.

### A.  Improper Admission or Exclusion of Evidence

#### 1.   The Court Properly Excluded Photographs of Snowfalls on December 26, 2010 and January 18, 2011

Plaintiffs first argue that the Court should have permitted the use of photographs of the snowfalls of December 26, 2010 and January 18, 2011.  Plaintiffs contend that they attempted to introduce these photographs for the purpose of demonstrating the mechanics of how an accumulation of water inside the Nautica entrance of the Macy's store occurred and in order to assist the jury in understanding Plaintiff's theory of the accident.  In support of their argument, Plaintiffs rely primarily on <u>Russo v. Mazda Motor Corp.</u>, CIV. A. 89-7995, 1992 WL 309630 (E.D. Pa. Oct. 19, 1992), which held that photographs can be admissible to demonstrate mechanical principles as testified to by a party's expert, in order to represent the theory proposed by that expert.  The <u>Russo</u> court reasoned as follows:

> The general rule is that items offered for purposes of illustration and clarification, such as photographs, are admissible if they are "sufficiently explanatory or illustrative of relevant testimony in the case to be of potential help to the trier of fact. Whether the admission of a particular exhibit will in fact be helpful, or will instead tend to confuse or mislead the trier, is a matter commonly viewed to be within the sound discretion of the trial court." 2 John W. Strong, et al., <u>McCormick on Evidence</u> § 212, at 9–10 (4th ed.1992) [hereinafter <u>McCormick on Evidence</u>]. When confronted with photographs, films, and videotapes of experiments or demonstrations that purport to replicate actual events, courts require the party seeking to admit the evidence to prove that the experiment or demonstration was conducted under substantially similar circumstances as the actual event. <u>Id.</u> § 214, at 19–20; <u>Jackson v. Fletcher</u>, 647 F.2d 1020, 1027 (10th Cir.1981).

[...]

On the other hand, when a party seeks to introduce photographs, films, and videotapes of experiments or demonstrations, not as a re-creation or representation of how an accident actually happened, but instead to illustrate general principles of physics, for example, courts do not impose the substantial similarity requirement. 2 McCormick on Evidence, supra, § 214, at 20. In these situations dissimilarities between experimental and actual conditions affect the weight of the evidence, not its admissibility. Szeliga v. General Motors Corp., 726 F.2d 566, 567 (1st Cir.1984).

Id. at *1-2.  Based on this discussion, the Russo court found that the photographs at issue in that case fell into the latter category.  Accordingly, the court found that the substantial similarity requirement did not apply and the photographs could be admitted.  Plaintiffs, likening their case to Russo, claim that their architectural expert, Len McCuen, would have used the photographs to assist his testimony regarding what he observed about the snowfalls and how the snow reacted to the architectural structures outside the Nautica entrance of Macy's.

The Court rejects this argument.  The purpose of the substantial similarity requirement, as discussed in the Russo opinion, "is to prevent admission of evidence that tends to mislead and perhaps confuse the jury and cause it 'to return a verdict which is based upon conclusions of fact that are contrary to what actually happened.'" Id. at *2 (quoting Jackson v. Fletcher, 647 F.2d. at 1028.)  The photographs here were taken three to four years after the incident in question, and do not depict weather conditions that were present on the day of the incident.  As such, Plaintiffs cannot satisfy the substantial similarity requirement and therefore attempt to argue that the photographs were intended to be "illustrative" of the "mechanical principles" of snow accumulation.  However, this "mechanics" argument ignores the fact that Plaintiffs were permitted to offer numerous other non-snow covered photographs of the pedestrian bridge and its arch-glass cover.  In addition, Plaintiffs' expert, Mr. McCuen, testified to (1) the walkway's architectural features, (2) the occurrence of snowfall several days earlier, and (3) how the snow

would have accumulated and eventually melted off the glass canopy. The Court finds that Plaintiffs' expert, with the assistance of other photographs, was able to testify to the mechanical principles involved and thereby present Plaintiffs' theory of the case.

Conversely, the probative value of the photographs taken on December 26, 2010 and January 18, 2011 was vastly outweighed by the danger of unfair prejudice and confusion of the jury, as well as being a waste of time. Fed. R. Evid. 403. The jury did not need the assistance of these particular photographs in envisioning what snow on a roof would have looked like. The photographs were therefore prejudicial and misleading because they created the impression that they depicted the condition of the pedestrian bridge on the day of the incident (even though there was *no* evidence of snow cover on this date) and were a waste of time because they were being offered to show what other photographs and testimony had already established — *i.e.*, snow could fall on the sloped glass roof and subsequently fall or melt off**.** The Court discerns no error in the exclusion these photographs.

### 2. The Court Properly Admitted the Testimony of Barry Golub Regarding the Course of Dealings between USI and Macy's

The Zapralas next assert that the Court should not have admitted the testimony of Barry Golub, USI's chief financial officer, concerning the course of dealings between USI and Macy's. Plaintiffs aver that the contract between Macy's and USI was unambiguous, and therefore the admission of Golub's testimony constituted extrinsic evidence that was improperly admitted. The Court previously denied Plaintiffs' motion in limine to bar Mr. Golub's testimony (Doc. 40), and will now address this issue once again.

Under Pennsylvania law, it is "firmly settled" that "the intent of the parties to a written contract is contained in the writing itself." Krizovensky v. Krizovensky, 425 Pa.Super. 204, 624 A.2d 638, 642 (1993) (citing Steuart v. McChesney, 498 Pa. 45, 444 A.2d 659 (1982)). "'Where

the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence'";

instead, the meaning of a clear and unequivocal written contract "'must be determined by its

contents alone.'" <u>Steuart</u>, 444 A.2d at 661 (quoting <u>East Crossroads Ctr., Inc. v. Mellon-Stuart</u>

<u>Co.</u>, 416 Pa. 229, 205 A.2d 865, 866 (1965)).  "[W]here language is clear and unambiguous, the

focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as,

perhaps, silently intended." <u>Id.</u> (emphasis in original).  "Clear contractual terms that are capable

of one reasonable interpretation must be given effect without reference to matters outside the

contract." <u>Krizovensky</u>, 624 A.2d at 642. However, "[w]here the contract terms are ambiguous

and susceptible of more than one reasonable interpretation, … the court is free to receive

extrinsic evidence, *i.e.,* parol evidence, to resolve the ambiguity." <u>Id.</u>   A contract will be found

to be ambiguous

> if, and only if, it is reasonably or fairly susceptible of different constructions and is
> capable of being understood in more senses than one and is obscure in meaning through
> indefiniteness of expression or has a double meaning. A contract is not ambiguous if the
> court can determine its meaning without any guide other than a knowledge of the simple
> facts on which, from the nature of the language in general, its meaning depends; and a
> contract is not rendered ambiguous by the mere fact that the parties do not agree on the
> proper construction.

<u>Id.</u> (citing <u>Z & L Lumber Co. of Atlasburg v. Nordquist,</u> 348 Pa.Super. 580, 585-86, 502 A.2d

697, 700 (1985)); <u>see</u> <u>also</u> <u>Mellon Bank Corp. v. First Union Real Estate Equity & Mortg.</u>

<u>Investments</u>, 951 F.2d 1399 (3d Cir. 1991).

        Accordingly, the question before the Court, in ruling on Plaintiffs' motion in limine, was

whether the language of the contract was clear and unambiguous on its face.  The Court found

that it was not.  Plaintiffs' motion cited only the most general provisions of the Janitorial

Contract.  (<u>See</u> Doc. 40 at 8-9) (citing "Janitorial Contract" at  ¶¶ 1, 3, 5, 13, 21, Attachment A,

& Attachment C.)  The Court did not believe that any of these provisions clearly and

7

unambiguously addressed the question of whether USI was required to patrol entryways for spills. Further, as USI now argues,[2] the only clearly delineated cleaning duties addressed in the Janitorial Contract are those set out in Attachment A ("Specifications").[3] The "Specifications" indicate that during store hours USI's staff was required to "mop all stains and spills, especially coffee and drink spills" in areas of the store such as "retail hard surfaces," "alterations," and the "beauty salon." (Id.) But with respect to "entrances," there is no similar requirement that USI "mop all stains and spills." (Id.) Thus, neither the Specifications nor any other provision in the contract indicates that USI was required to inspect the entryways or patrol for spills. Rather, the only patrolling duties in the Specifications were for USI to "police restrooms hourly to clean normal spills, remove stains[,] and replenish supplies." (Id.)

As such, the Court could not find that the language of the contract clear and unambiguous and therefore grant Plaintiffs' motion in limine. Mr. Golub's testimony was offered for the very purpose of elucidating this ambiguity in the language of the contract. USI's position was that it's only duty was to respond to emergency calls for cleanup made by Macy's employees. Mr. Golub's testimony was offered as extrinsic evidence of this "course of dealing" or "trade custom and usage." Specifically, Mr. Golub testified that in every Macy's store from New England to Virginia where USI provides cleaning services, the porter receives "emergency calls" through a cellular phone or PA system, and is not expected to patrol to discover spills. (Trial Tr. 84:8 – 88:2, February 8, 2011.) Mr. Golub's testimony was admissible to clear up the ambiguity in the contract created by its silence as to these matters. The Court's admission of this extrinsic evidence was proper under Pennsylvania law, and no error was committed in this regard.

---

[2] USI did not file a response in opposition to Plaintiffs' motion in limine.

[3] Attachment A was introduced at trial as Plaintiffs' Exhibit 44.

**3.     The Court Properly Admitted the Testimony of Defendant's
Janitorial Services' Expert Eugene Lollo**

Plaintiffs next argue Eugene Lollo was not qualified to testify as an expert in this matter

because his testimony was not in compliance with Fed. R. Evid. 702. Specifically, the Zapralas

claim Mr. Lollo failed to articulate any methodology that may be deemed reliable and his

testimony failed to conform to the "fit" prong of Fed. R. Evid. 702.  The Court previously denied

Plaintiffs' motion in limine to preclude Mr. Lollo's testimony (Doc. 30), and will once again

address Plaintiffs' assertions that Mr. Lollo should not have been permitted to provide expert

testimony.

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Rule 702

provides are follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of
> fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011).[4] The Third Circuit has explained that Rule 702 has "three major

---

[4]  This is the text of the current version of Fed. R. Evid. 702, which became effective on December 1, 2011.
When this case went to trial in February 2011, a different version of Rule 702 was in place.  That version of
Rule 702 (which itself became effective in 2000)  read as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the
> evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the
> testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles
> and methods, and (3) the witness has applied the principles and methods reliability to the facts of the
> case.

As the Advisory Committee's Notes make clear, there is no substantive difference between the 2011 version
of Rule 702 and the pre-2011 version of Rule 702.  See Fed. R. Evid. 702 advisory committee's notes (2011
Amendments) ("The language of Rule 702 has been amended as part of the restyling of the Evidence Rules to

requirements": the proffered witness must (1) "be an expert, *i.e.* must be qualified"; (2) "testify about matters requiring scientific, technical[,] or specialized knowledge"; and (3) present testimony that "assist[s] the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). Thus, in order to be admitted, an expert's testimony must demonstrate "qualification, reliability, and fit." Schneider ex. Rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir.2003.)

Rule 702 has "a liberal policy of admissibility." Pineda, 520 F.3d at 243 (quoting Kannankeril v. Terminix Inter., Inc., 128 F.3d 802, 806 (3d Cir.1997)). In the seminal case Daubert v. Merrell Dow Pharm., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court explained that, under the Federal Rules of Evidence, the trial judge acts as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable." 509 U.S. at 589; Pineda, 520 F.3d at 244; Czarnecki v. Home Depot USA, Inc., CIV.A.07-4384, 2009 WL 1706582 (E.D. Pa. June 15, 2009). "[An] expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Pineda, 520 F.3d at 244 (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) [hereinafter Paoli II]). Accordingly, the focus of the Court's inquiry is on the methodology used by the expert, not the conclusions reached. See id. Exclusion of expert testimony is the exception rather than the rule because "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Fed.R.Evid. 702 (advisory committee notes) (citing Daubert, 509 U.S. at 595, 113 S.Ct. 2786).

---

make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.").

### a.  Qualification

"Qualification requires the witness possess specialized expertise," Pineda, 520 F.3d at

244 (citing Schneider, 320 F.3d at 404), which encompasses a "broad range of knowledge, skills,

and training," Pineda, 520 F.3d at 244 (citing Paoli II, 35 F.3d at 741).

Here, USI proffered Mr. Lollo as an expert witness in commercial building housekeeping

and porter services.[5]  At the time of trial, Mr. Lollo had been involved in the commercial

housekeeping services business for 28 years and had owned his own janitorial company, Dakota

Building Services, Inc., for eight years.  Mr. Lollo's own clients have included large department

stores such as J.C. Penney and he has regularly provided porter service.  Mr. Lollo has also

served as a consultant to review cleaning contracts and write specifications for companies.

Finally, Mr. Lollo has received training regarding janitorial housekeeping services through the

International Contractors Association.

The Third Circuit has made clear that a witness may be qualified based solely on

practical experience. Paoli II, 35 F.3d at 741 ("Rule 702's liberal policy of admissibility extends

to the substantive as well as the formal qualification of experts.")  Formal qualifications, such as

a degree in a particular field, are not required.  Accordingly, the Court found Mr. Lollo to be

qualified to provide the "industrial standard" expected of housekeeping and porter contractors.

The Court finds did not err in determining Mr. Lollo to be a qualified expert under the liberal

standard provided by Rule 702.

### b.  Reliability

In addition, "an expert's testimony is admissible so long as the process or technique used

in formulating the opinion is reliable," Pineda, 520 F.3d at 247 (citing Paoli II, 35 F.3d at 742),

---

[5] A porter is an individual assigned to work in an establishment during business hours to maintain cleanliness.

and the expert's principles and methods are reliably applied to the facts of the case. Paoli II, 35 F.3d at 745; Fed. R. Evid. 702 advisory committee notes.  The Supreme Court in Daubert and the Third Circuit in United States v. Downing, 753 F.2d 1224, 1238-39 (3d Cir. 1985) have articulated several factors that a district court should take into consideration when evaluating the whether a particular scientific methodology is reliable.[6]  In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court extended these factors to apply to "the testimony of engineers and other experts who are not scientists." Id. at 141, 119 S.Ct. at 1171.  Thus, when considering non-scientific expert testimony, a district court may consider one or more of the factors set forth in Daubert when doing so will help determine the reliability of the expert. Id.  The Kumho Court also recognized, however, that because "there are many different kinds of experts, and many different kinds of expertise," id. at 150, 119 S.Ct. 1167, "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Id. at 141, 119 S.Ct. 1167; see also United States v. Davis, 397 F.3d 173, 178 (3d Cir. 2005).  Thus, while the reliability factors announced in Daubert may or may not be instructive in cases involving non-scientific expert testimony, the ultimate purpose of the reliability requirement simply "to make certain an expert, whether basing testimony upon professional studies *or personal experience*, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the field." Kumho, 526 U.S. 137, 152, 119 S.Ct. 1167 (emphasis added).

Here, Plaintiffs offer two arguments as to why Mr. Lollo's testimony was not based on

---

[6] These are: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. See Paoli II, 35 F.3d at 742 n. 8.

reliable methodology.  Plaintiffs claim Mr. Lollo's methodology, as indicated in his expert report, was based on a "combination of his own misguided and subjective interpretation of the Janitorial Contract blended with his experiences with other clients, which [were] irrelevant for purposes of this litigation. (Doc. 58-1 at 6.)  Plaintiffs further argue that Mr. Lollo could not offer his "personal interpretation of an instrument of law such as the Janitorial Contract as he possesses no legal expertise…[;] has not taken any courses in law[;] has never taken any education courses in engineering, accident reconstruction, [or] walkway safety[;] has never been qualified as an expert in any court[;] and has never been qualified as an expert to testify in areas dealing with cleaning…." (Id.)  The Court finds that Plaintiffs' contentions have no support in law or fact.

Plaintiffs have not, and likely could not, cite any case law which states that only individuals who have previously testified in other cases can be called upon as experts.  Further, the subject on which Mr. Lollo was called to testify does not require that he have a legal background. Mr. Lollo has extensive experience as a commercial cleaning contractor, and it was entirely appropriate for him to apply his personal knowledge and experience in this area to the facts of this case. See e.g., Davis, 397 F.3d at 178; Fisher v. Walsh Parts & Serv. Co., Inc., 277 F. Supp. 2d 496, 505 (E.D. Pa. 2003).  Specifically, Mr. Lollo's testimony, like Mr. Golub's testimony, was relevant to identifying the trade customs and practices in the commercial janitorial industry and assisting the jury in understanding the expectations of Macy's and USI under their contract for janitorial and porter services. Further, Mr. Lollo could also testify as to what any ambiguous terms contained in the Janitorial Contract generally mean in the industry.

Whether or not Mr. Lollo's understanding of the contract was "misguided and subjective" was (1) an issue for Plaintiffs to bring out on cross-examination and (2) a question

13

for the jury to determine in assessing Mr. Lollo's credibility and how much weight to give his testimony.  Thus, none of Plaintiffs' assertions call into question Mr. Lollo's reliability.  The Court therefore did not err in finding Mr. Lollo's methodology satisfied the reliability requirement.

### c.  Fit

Finally, in assessing the third requirement for the admissibility of expert testimony, the testimony's "fit," the Court must ascertain whether the testimony is "relevant for the purposes of the case" and whether it "assist[s] the trier of fact." Schneider, 320 F.3d at 404. This "helpfulness standard" requires a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. (quoting Daubert, 509 U.S. at 591-92, 113 S.Ct. 2786).

As previously discussed, Mr. Lollo was called to testify as to the industrial standard of care expected of housekeeping and porter contractors like USI.  Given that this was a negligence action, the purposes of Mr. Lollo's testimony was entirely relevant to this case.  As such, the Court found the "fit" prong had also been satisfied.  The Court does not now find that it erred in this determination.

Accordingly, because all three requirements for the admission of expert testimony were met, the Court finds that it appropriately admitted the testimony of USI's janitorial services expert Eugene Lollo.

### 4.  The Court Properly Admitted the Expert Testimony of Defendant's Meteorologist, Steve Wistar, Regarding the Lack of Snow Cover on the Day of the Alleged Incident

The Zaparalas next argue that the Court should not have permitted testimony from Stephen Wistar, USI's meteorologist, regarding his contention that no precipitation fell during the period in question.  Additionally, Plaintiffs contend the Court should not have permitted Mr.

Wistar's testimony that snow in the parking garage, walkway, or elsewhere around the Macy's store had melted naturally prior to March 10, 2007.  Plaintiffs filed a motion in limine on this issue (Docs. 31 & 41), which was denied by the Court.

Here, Plaintiffs do not challenge Mr. Wistar's qualifications or the reliability of his methodology.  Rather, Plaintiffs only challenge the "fit" prong of the admissibility of expert testimony.  As previously stated, the "fit" requirement demands that the Court ascertain whether the testimony is "relevant for the purposes of the case" and whether it "assist[s] the trier of fact." Schneider, 320 F.3d at 404.  Plaintiffs challenge that the fit requirement was not met because Mr. Wistar testified that he was advised of certain snow removal activities by defense counsel, but was not personally aware of when the snow was removed or that it had in fact melted.  Accordingly, Plaintiffs argue, Mr. Wistar merely parroted information given to him by the defense.  In addition, Plaintiffs claim Mr. Wistar was unaware of how much, if any, of the snow would have remained on various structures outside of the Macy's entrance, and had no information as to the rate of snow melting on different surfaces.

The Court finds these arguments unpersuasive. Mr. Wistar offered expert testimony that, based on climatological data, there was no snow or ice on the ground at King of Prussia Mall on the date of the incident.  This testimony was clearly "relevant for the purposes of the case," because the Plaintiffs' entire theory of this case was that Barbara Zaprala slipped on snow or iced tracked into the Macy's store by customers.  Further, Mr. Wistar, like any other expert, was not required to have personal knowledge of certain facts or data that were used in formulating his opinion.  "An expert may base an opinion on facts or data in the case that the expert *has been made aware of* or personally observed." Fed. R. Evid. 703 (2011) (emphasis added).  As such, it was entirely proper for him to rely on information received by or made known to him at or

15

before trial.  In this case, this meant that Mr. Wistar could be made aware that there had been

testimony, from Jessica Nelson (the Mall's operations officer), that on the afternoon of March 7,

2007 the parking lot had been salted by maintenance crews. (Trial Tr. 15:22 – 17:15, February 8,

2011.)  Mr. Wistar properly used this information in formulating his opinion that the salt would

have increased the rate at which the snow melted, and consequently there would have been no

snow present by March 10, 2007.

      The true source of Plaintiffs' ire appears to be the fact that Mr. Wistar was not an

eyewitness to the ground conditions outside of the Macy's entrance on the day of the incident

and admitted that he had not visited the site of the incident.  But this is of little consequence,

given that Plaintiffs did not produce any climatological data or any eyewitnesses to contradict

Mr. Wistar's opinion that there was no snow in the parking lot or on the pedestrian walkway on

the date of the incident.  Any remaining deficiencies Plaintiffs perceived in Mr. Wistar's

testimony were best addressed during cross-examination.  Fed.R.Evid. 702 (advisory committee

notes) (citing Daubert, 509 U.S. at 595, 113 S.Ct. 2786).  Based on the foregoing, the Court finds

it did not err in admitting Mr. Wistar's testimony.

      **5.**      **The Court Did Not Limit the Testimony of Plaintiffs' Expert Architect, Len McCuen, to the Four Corners of His Expert Report or In Any Other Way Improperly Limit His Testimony**

      Plaintiffs next argue that the Court improperly limited the testimony of its expert

architect, Mr. McCuen, to the information contained his expert report, but did not similarly limit

USI's expert meteorologist, Mr. Wistar.  This argument appears to be a variation of the argument

Plaintiffs advanced in section III.A.4., *supra*.  Plaintiffs aserted in section III.A.4 that the Court

erred at trial in permitting Mr. Wistar to be made aware that there had been testimony  from Ms.

Nelson that the parking lot had been salted on March 7, 2007.  Mr. Wistar learned this

16

information for the first time at trial.  Plaintiffs now characterize the fact that Mr. Wistar was permitted to be made aware of this information, and thereby testify as to effect salt would have had on the rate of snow melting, as "allowing Mr. Wistar to testify beyond the scope of his expert report." (Doc. 58. ¶ 22.)  Plaintiffs assert that either the Court "erred in allowing Mr. Wistar's testimony beyond the scope of his report, or, in the event such was permissible, Mr. McCuen should not have been precluded from testifying to like matters within his expertise." (Id.)  Plaintiffs conclude "[t]here was no valid reason for the difference in treatment of the two experts' testimony." (Id. at 21.)

The Court disagrees with both of Plaintiffs' contentions: Mr. Wistar did not testify beyond the scope of his expert report, and Mr. McCuen's testimony was not in any way improperly limited.  First, with respect to Mr. Wistar, the Court notes that Ms. Wistar's expert report concluded that "[m]ost, if not all of [the snow that fell on March 7, 2007] melted naturally before the period in question." (Doc. 38, Ex. A.)  Mr. Wistar's report was dated June 22, 2010. Subsequently, at his deposition on January 31, 2011, Mr. Wistar again elaborated that any snow or ice that would have accumulated would have melted naturally by March 10, 2007. (Doc. 38, Ex. B at 88-92)  Plaintiffs had the opportunity to question Mr. Wistar at his deposition.  Between the content of the expert report and the deposition, it could not have come as a surprise to the Plaintiffs that the entire gist of Mr. Wistar's expert opinion was that there would have been no snow remaining by the date of the incident.

Mr. Wistar admitted at his deposition, in response to questioning by both Plaintiffs' counsel and defense counsel, that he was not aware of whether the parking lot had been salted. The Court permitted defense counsel to inform Mr. Wistar of this fact at trial. The question exact posed to Mr. Wistar by the defense was this:

> Q:    So there has been testimony in this case that on the afternoon of March 7, 2007 the parking lot that you can see in this photograph here was salted by maintenance crews of the mall.  **All I want to ask you is what effect does salt on a blacktop surface have on a snowfall**.

(Trial Tr. 17:10 – 17:15, February 8, 2011.)  Mr. Wistar's response was "[t]he salt will increase melting," and he went on to elaborate on the physics of why this is the case.  As previously discussed, Fed. R. Evid. 703 permits Mr. Wistar to be made aware that the parking lot was salted.  Moreover, Mr. Wistar's testimony that the salt would have increased the rate at which the snow melted is entirely consistent with his opinion, as previously expressed in his report and at his deposition, that there would have been no snow remaining on the date of the incident.

Second, with respect to Mr. McCuen, Plaintiffs offer no explanation as to how his testimony was in any way limited.  Rather, Plaintiffs only vaguely aver that Mr. McCuen should have been permitted to testify to "like matters" that were "within his expertise" but not expressly included in his expert report (Doc. 58. ¶ 22.)  The Court finds this argument to be unclear and without merit.  If anything, the Court *did* permit Mr. McCuen to testify beyond the scope of his expert report.  Specifically, in his expert report Mr. McCuen concluded:

> The location where Ms. Zaprala fell was in a dangerous condition at the time of her accident due to wetness/slush and/or dried salt on the hard, shiny floor surface.  The contamination was from precipitation that was tracked into the store from outdoors.  This was a pedestrian safety hazard and caused Ms. Zaprala to slip and fall.

(Doc. 25, Ex. C at 15.)  Mr. McCuen attributed the slick spot to precipitation which had been tracked into the store due to "residual compacted or piled snow and ice." (Id. at 11.)  Mr. McCuen never states anywhere in his report another source of moisture allegedly tracked into the store was snow and ice accumulating on the glass canopy over the pedestrian bridge and subsequently falling off.  To the contrary, Mr. McCuen praised the glass canopy as an effective measure for preventing snow and ice from being tracked in.  He stated, "By providing a canopy

outside the doorway and a foyer consisting of exterior and interior sets of doors, the building

inherently addressed this issue to the extent reasonably practical." (Id.)  At trial, however, Mr.

McCuen stated the following:

> Usually when you do have a canopy that's projecting out from an entrance and the idea is to protect from the rain and so forth, you would always expect that that structure, be it curved or an A-frame whatever[,] would overlap the walkway such that any rain or snow or anything would shed off, completely off[,] and drain away from the walkway.  **This one is a little unique.  It does the exact opposite**.  What it does is it drains here when anything roles [sic] off of it, and you have about an eight-foot gap on either side of the covered area that the walkway extends out.  And this whole bridge is slightly pitched down towards the doors and it's also panned slightly so that it drains in.  **So whenever you have anything that's rolling off of that roof, it's coming down and instead of doing what you would normally hope it would do, which is go away from the walkway, this is actually going to head right into the walkway and down towards the door**.

(Trial Tr. 4:18 – 5:14, February 7, 2011) (emphasis added)  Mr. McCuen further testified,

"Overall, architecturally it's pretty good.  It has certain aspects to it that I like, in strictly terms

of walkway safety, but it does have this one serious problem and it's particularly important when

dealing with snow." (Trial Tr. 5:24 – 6:4, February 7, 2011.)  As is evident, the Court permitted

Mr. McCuen to speculate that there could have been water or snow accumulating outside the

Macy's door even though there was no evidence that this was actually the case.  At best, this

testimony was beyond the scope of Mr. McCuen's expert report.  At worst, it was, as USI argues,

in direct contradiction to Mr. McCuen's expert report.

Accordingly, the Court finds that it did not err by in any way limiting Mr. McCuen's

testimony.

**B.  Improper Instructions to the Jury**

**1.     The Court Properly Instructed the Jury Regarding the Duty of Care Owed by Defendant**

Plaintiffs next argue that the Court should have modified its charge to the jury to address

the specific duty of care owed by the Defendant.  Specifically, Plaintiffs maintain that the charge

to the jury did not adequately advise the jury that the specific duty of care that USI had to

Barbara Zaprala was the "same" duty of care that Macy's had to Barbara Zaprala.  In support of

this argument, Plaintiffs rely solely on Torres v. Control Bldg. Services, CIV.A. 09-CV-0178,

2010 WL 571789 (E.D. Pa. Feb. 16, 2010), another case involving a slip and fall in which the

plaintiffs sued Lincoln Plaza Associates (the owner and operator of the premises) and Control

Building Services (the company in charge of cleaning the mall), among others.  Plaintiffs cite the

following language from Torres:

> The duty to Plaintiffs in this case arises out of ownership of the land. It is Defendant
> Lincoln Plaza Associates that owns the land, and it, therefore, had a duty to Plaintiffs. In
> addition, the Restatement (Second) of Torts § 383 makes independent contractors liable
> **to the same extent as a landowner**, and Defendant Control Building Services, therefore,
> also owed a duty to Plaintiffs.

Id. at *5 (emphasis added).  The Court is not persuaded by Plaintiffs' argument, and finds that it

did not err in not using the precise language that Plaintiffs now argue should have been included

in the jury instructions.  In total, the Court's charge to the jury included six separate instructions

on the issue of negligence.  The Court finds that those instructions, taken together, adequately

advised the jury of the duty of care USI owed to Barbara Zaprala.  In particular, the charge

included the following two instructions:

**NEGLIGENCE - EXPLANATION**

One who does an act or carries on an activity upon land on behalf of the owner is not an
insurer of safety of those who enter upon its premises.  As such, the mere existence of a
harmful condition in a public place of business, or the mere happening of an accident due
to such a condition is not evidence of negligence. Rather, to impose liability on one who
does an act or carries on an activity upon land on behalf on an owner, a Plaintiff must
present evidence tending to prove that the person deviated from some duty of reasonable
care.  See Moultry v. Great A & P Tea Co., 422 A.2d 593, 595-96 (Pa. Super. 1980).

**NEGLIGENCE – LIABILITY OF THOSE WHO ACT ON BEHALF OF OWNER**

One who does an act or carries on an activity upon land on behalf of the owner is
required to carry out such activities for which they are on the land with reasonable care

for the safety of invitees, but only if they should expect that those invited will not discover or realize the danger, or will fail to protect themselves against it.  Restatement (Second) Torts Sections 383, 341A.

(Jury Instructions at 28-29.)  Thus, in addition to providing the standard Pennsylvania instruction defining "negligence," the Court also instructed on the general duty of those who act on behalf of a possessor of land, as set forth in Restatement (Second) Torts §§ 383, 341A.  The Court finds it was unnecessary to specifically state that USI has the "same duty of care that Macy's had to Plaintiff" given (1) all the other instructions provided on the issue of negligence, and (2) Macy's not being a party to this lawsuit (unlike the multiple defendants involved in Torres). To have done so would have only been confusing to the jury.  Moreover, as USI points out, the Restatement (Second) Torts § 383 places the same liability on an independent contractor as the possessor of land, but *only* to the extent of the act or activity the independent contractor is performing on behalf of the possessor.  See Weiser v. Bethlehem Steel Corp., 353 Pa.Super. 10, 508 A.2d 1241, 1246.  It would therefore have been inaccurate for the Court to suggest to the jury that USI owed the same duty, in all respects, as did Macy's.

     **2.**      **The Court Did Not Err in Not Including Plaintiffs' Proposed "Negligence—Notice" Instruction**

Plaintiffs next argue the Court should have included a proposed instruction entitled "Negligence—Notice." The proposed "Negligence—Notice" would have stated the following:

**NEGLIGENCE – NOTICE**

Furthermore, in a slip and fall case such as this one, a Plaintiff must prove that the defendant had notice of the condition before liability may be imposed.  Notice may be proven in a few ways.  Where the condition is one which the owner knows has frequently recurred, the owner may be considered to have actual notice of that condition.  Alternatively, the owner may be deemed to have constructive notice of the condition where the evidence indicates that the condition is transitory, created by persons other

21

> than those for whom the owner is accountable, and existed for such a length of time in the exercise of reasonable care, the owner should have known about it. Moultry v. Great A & P Tea Co., 422 A.2d 593, 596 (Pa. Super. 1980).

Plaintiffs offer no explanation as to why the Court's "failure" to include this instruction should result in a new trial. Plaintiffs merely state, in the most conclusory terms, that they objected to the omission of this instruction and that the failure to include it was "improper, unfairly prejudicial[,] and confusing to the jury." (Doc. 58 ¶6). This is insufficient.

It is unclear to the Court why Plaintiffs are insistent that this instruction needed to be included. The language of the instruction sets out, in part, what Plaintiffs needed to prove in order to make out a prima facie case of negligence in a slip and fall case. USI has argued, both in its response in opposition and at trial, that the inclusion of this instruction was improper on both factual and legal grounds. (See Trial Tr. 15:7 – 17:20, February 8, 2011, Charging Conference.) First, USI contends that inclusion of the instruction was improper on the facts of this particular case because the instruction is only proper when there is sufficient circumstantial evidence for a jury to infer that the harm causing condition had existed for a sufficient period of time to establish either actual or constructive notice. Second, USI argues the proposed notice instruction would have been improper because USI's only duty was to perform any act or activities it was doing for Macy's, the possessor of the land, in a reasonable manner.

The Court agreed with both of these arguments. As has been discussed, neither Barbara Zaprala nor her expert architect was able to provide sufficient circumstantial evidence for a jury to infer that the alleged slick spot existed. Thus, there was no evidence that a harmful condition actually existed — only speculation. As such, it would have been improper for the Court to instruct the jury as to whether USI was on notice, either actual or constructive, of a harmful condition where there was no evidence one existed. In addition, as has been discussed, USI was

neither the owner nor the possessor of the premises in question. The language of the instruction, which refers to the "owner" of the premises in question, is inappropriate. As illustrated by the negligence instructions that were given, USI's only duty was to perform any act or activities it was doing for Macy's in a reasonable manner. Restatement (Second) Torts §§ 383, 341A; Weiser v. Bethlehem Steel Corp., 353 Pa.Super. 10, 508 A.2d 1241, 1246. It was up to the jury to determine whether that duty included inspecting entryways and/or patrolling for spills.

### C. The Jury's Verdict was against the Clear Weight of Evidence

Finally, Plaintiffs argue the jury's verdict was against the clear weight of evidence and resulted from improper considerations that were contrary to the law. Plaintiffs' argument here is based entirely on their aforementioned contention that the contract terms between Macy's and USI were unambiguous. Plaintiffs' again argue that the contract "clearly indicated" USI's duties and responsibilities, and that factual testimony "clearly indicated" that USI breached that duty.

The Court wholly rejects this argument. The Court has already discussed why the contract was not unambiguous. But more importantly, Plaintiffs' argument is misguided because this was a negligence action, not a breach of contract action. Whether or not the Janitorial Contract was clear and unambiguous does not conclusively answer the question of whether USI acted reasonably. Because the contract was ambiguous, extrinsic evidence regarding its meaning was properly admitted. From this extrinsic evidence, the jury was free to accept USI's theory of the case, which was that USI was only expected to respond to emergency calls, and did not receive a call regarding the alleged slick spot. But even if, as Plaintiffs suggest, the contract established that USI had a duty to continually inspect the entryways and patrol for spills, the jury still could have found that USI acted reasonably and return a verdict in USI's favor. Based on the evidence presented at trial, either finding by the jury would have been proper. The trouble

with Plaintiffs' case is that they were unsuccessful in establishing that the slick spot existed or, if it existed, what was its source.  Plaintiffs are therefore incorrect in suggesting that contract and the factual testimony "clearly indicated" anything.

The Court does not find the jury verdict was not against the clear weight of evidence.

### IV.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for New Trial is denied.  An appropriate order follows.